# GWYNN v. GWYNN.

WILLS; TRUSTS AND TRUSTEES; CONSIDERATION.

A testator gave to his daughter a sum of money in trust to apply the same to the maintenance and education of his grandson away from his paternal home at a school to be selected by the daughter, and provided that if she was hindered by the child's parents in the execution of the trust, the fund should go to her absolutely. Claiming to be so hindered, the trustee wrote to the child's father that she had decided that the fund which by the conditions of the will reverted to her, should be invested by a friend in the child's name to be given him with the accumulated interest upon his reaching manhood, and that such friend would show her how to draw up a paper to insure the payment of the money to the child in event of her death. Subsequently the father wrote to the trustee that he declined to comply with the terms of the bequest and recognized its forfeiture by his son. The father thereafter claimed he had reconsidered and recalled his declination and the trustee claimed he had not done so. On attaining his majority the son filed a bill in equity against the trustee to establish a trust and for an accounting, and this court *held*, reversing the decree of the lower court,

(1) That the conditions of the bequest were valid;

(2) That the express declination of the legacy by the child's father was at the time sufficient to justify the defendant's claiming the fund as her own;

(3) That whether such declaration could be withdrawn by the father within a reasonable time, and the trust thereby reopened against the will of the defendant, *quære*; but if so, the burden of proving such withdrawal was on the complainant, and

(4) That the expression by the defendant of an intention to invest the fund for the use of the child did not create a trust enforceable in equity, but amounted merely to a promise in favor of a volunteer supported by no valuable consideration.

No. 719. Submitted October 22, 1897. Decided December 8, 1897.

HEARING on an appeal by the defendant from a decree establishing a trust and ordering payment of a sum of money in execution thereof. *Reversed.*

The COURT in its opinion stated the case as follows:

This is an appeal from a decree establishing a trust and ordering payment of the sum of $1,000, with interest, from July 1, 1883, in execution thereof.

The complainant, Walter Gwynn, who attained his majority August 21, 1891, filed the bill against his aunt, Mary Gwynn, February 23, 1894. He alleged that he is the grandson of Walter Gwynn, who died testate in February, 1882, and the legatee named in the sixth clause of the will of said Walter Gwynn, which reads as follows:

"Sixth. I give and bequeath unto my daughter Mary Gwynn, the sum of one thousand (1,000) dollars to be by her applied and paid out from time to time, until the said sum has been exhausted for the maintenance and education of my grandson, Walter Gwynn, a son of my son Henry Gwynn, which payments must be understood as meaning only such expense of boarding, clothing, travelling, tuition fees, &c., as will be incident and subservient to his maintenance and education at such place, school or college and at no other as my said daughter Mary may elect, prefer, prescribe and direct, away from the paternal home of my said grandson, Walter Gwynn; and upon no other consideration shall the said sum of one thousand (1,000) dollars, nor any part thereof, be so paid out and applied; in the event of the death of my said grandson Walter, before the said sum of one thousand (1,000) dollars shall have been so paid out for his maintenance, education, etc., as above directed, then the whole sum of one thousand (1,000) dollars, or any part thereof, remaining unpaid and in the hands of my said daughter Mary, I give and bequeath unto her, for her sole use and benefit; or should his parents, or other legally constituted guardian or guardians, restrain, hinder, or in any way prevent my said daughter Mary, from sending my said grandson Walter, as above directed, to such place, school or college, as she may elect, etc., then I bequeath unto my said daughter Mary, for her sole use and benefit, free and discharged of all trusts, the whole of the said sum of one thou-

sand (1,000) dollars, or as much thereof as may be remaining in her hands, resulting from the partial prevention of her literal compliance with the terms, conditions and requirements of this bequest of one thousand (1,000) dollars to her made, for the maintenance and education of my grandson Walter Gwynn."

He further alleged that the defendant, Mary Gwynn, named as trustee in said will, accepted the said trust, and on May 2, 1882, wrote a letter agreeing to pay certain expenses of complainant, who, then a lad of twelve years, was at a school in Maryland under the management of Dr. Kinear. That on May 30, 1882, defendant claimed, without just cause or foundation therefor, that she had been hindered in her attempts to send complainant to a school of her selection; and wrote a letter to complainant's father making the following statement therein:

"I have at once decided that the sum of one thousand dollars, which by the conditions of the will now reverts to me free of trust, and being absolutely free to dispose of it, shall be invested by Mr. Dickinson in Walter's name to be given him, with the accumulated interest, upon his reaching manhood. He will show me how to draw up a paper to insure to him in the event of my death before that time."

That the proviso in the will respecting the selection of a school had not been violated; and at the end of the session of the Kinear school complainant's parents were ready and willing to send him to any school selected by defendant, and she was so informed. That she, "in her eagerness to be rid of said trust and to convert the said sum to her own use, unjustly claimed said forfeiture had occurred, and for the purpose of preventing litigation over the matter at the time and the enforcement of complainant's rights in securing a proper administration of said trust she lulled him and his parents into inaction by the declarations made in her letter of said May 30, 1882, as to the securing of said sum to complainant upon his reaching his majority."

That since attaining majority he has called upon defendant for an account as trustee, which has been refused; and he has discovered that she never carried into effect the promise made in the letter of May 30, 1882, to invest said sum for him, and that she never intended to do so, the said promise having been part of a scheme to convert the money to her own use. . The prayers were for a decree (1) requiring defendant to account for said trust fund and for a reference to ascertain when the same came into her hands, disbursements thereof, if any, and so forth. (2) For the establishment of the trust created by the will and for payment of the money with interest.

Defendant answered the bill admitting the will and its probate. She denied that she entered upon the trust because she says that though she communicated with the father of complainant, and informed him that she was anxious to execute the trust, and begged that complainant might be sent to a school in Virginia, he refused his permission and declined to accept the conditions of the trust. That she then wrote to him and notified him that she then claimed the money under the terms and provisions of the will. She admits that she did write to him her intention (and that at the time she had that intention) to have the said sum of $1,000 invested by Mr. Dickinson in complainant's name. That said sum had not then come into her hands from the estate, and she abandoned the intention and so informed complainant's father. She further says that she again urged complainant's father to permit complainant to receive the benefit of the will by conforming to the conditions thereof, and that he again refused, and to make his former refusal final and decisive wrote to defendant on June 22, 1882, as follows:

"I hereby decline to conform to the terms of a certain legacy contained in the will of the late Gen'l Walter Gwynn for the benefit of my son Walter, the said legacy in such will reverting by forfeit in such case as therein provided."

*Messrs. Gordon & Gordon* for the appellant:

Whatever may have been said by the defendant as to an intention to invest the sum of $1,000, when it came into her hands, for the benefit of the complainant, that intention was never carried into effect. No fund was invested and no instruction given to Mr. Dickinson. No trust was created by the mere writing, as it was without consideration and incomplete. The matter was merely something to be done in the future, and something not done. The authorities on this subject are positive. *Banks* v. *May's Heirs*, 3 A. K. Marsh, 436.

In *Swan* v. *Frick*, 34 Md. 139, the court refused to establish a trust on the voluntary agreement of the settlor, made without consideration, the proposed settlor, at the time, contemplating some further act for the purpose of making it complete. See also *Bagley* v. *Boulcott*, 4 Russel, 345; *Evans* v. *Battle*, 19 Ala. 403; *Lloyd* v. *Brooks*, 34 Md. 27; *Heartley* v. *Nicholson*, 19 L. R. (Eq. Cas.) 233; *Cotteen* v. *Missing*, 1 Maddox, 103; *Jones* v. *Lock*, 1 Ch. App. 25; *Dipple* v. *Corles*, 11 Hare, 183.

*Mr. Irving Williamson* for the appellee:

If it be contended that the trust, as created by the will, clothed the appellant with discretionary power, then, it is submitted, with confidence, that under the law and case made by the bill and proof, appellant's conduct is subject to examination by a court of equity. 2 Perry on Trusts (4th Ed.), Sec. 511, 519; *Read* v. *Patterson*, 44 N. J. Eq. 211; *Eldridge* v. *Heard*, 106 Mass. 582; *Wormley* v. *Wormley*, 8 Wheaton, 421. In *Colton* v. *Colton*, 127 U. S. 300, the doctrine is stated that the court will interfere whenever the exercise of discretion by trustees is infected with fraud or misbehavior, and generally where the discretion is mischievously and erroneously exercised. *McDonald* v. *McDonald*, 92 Ala. 537; *Tempest* v. *Lord Camoys*, 21 Ch. Div. 571 (578); Hill on Trustees (4th Am. Ed.), top p. 765; *Bound* v. *S. C. R. Co.*, 50 Fed. Rep. 853.

Under these principles it is clear, that the conduct of appellant was most improper, and any discretion reposed in her has been exercised in favor of her private interest, and such a state of affairs renders her amenable to the decree of the proper court. But under the terms of the trust, the only discretion reposed in the appellant was the selection of a "place, school or college," away from the paternal home of the appellee, where he was to be educated. The forfeiture to her was not dependent upon her discretion; she had a right to refuse to claim a forfeiture, but the question whether this money was to revert to her, in whole or in part, depended upon a fact, which must first transpire. Any erroneous decision by appellant as to the happening of that fact does not bind appellee. No claim of forfeiture can successfully be made that is based upon premature acts or decisions. 1 Lewin on Trusts, *p. 616; *Moore* v. *Clinch*, 1 Ch. Div. 447 (453). The purpose of the testator was the education of appellee, in the manner directed. The forfeiture to appellant was a secondary matter. 1 Perry on Trusts, Sec. 328, 427.

The duty of a trustee, such as the appellant was, is clearly shown by the following authorities: 1 Perry on Trusts, Sec. 328, 427; *Bound* v. *Railroad*, 50 Fed. Rep. 853; *Railroad Co.* v. *Duvant*, 95 U. S. 578.

Mr. Justice SHEPARD delivered the opinion of the Court:

1. With the motives that prompted the terms and conditions of the clause of the will creating the trust sought to be established, we have no concern, and will not go into the matter further than to say—so as to avoid possible misconception—that the testator was a man of deep and earnest faith in the truths of the Christian religion and deemed his son an unsafe guardian of the education of the grandson, because he regarded him as destitute of such faith. He was dealing with his own estate; the conditions were lawful, and the question is, whether they were in fact re-

jected by complainant's father in a manner such as effectually to bar the claim of the son.

2. It has been contended, on the part of the appellant, that even were it conceded that there had been no forfeiture of the legacy, it could not now be claimed without violence to the purpose and express conditions of the will, and the fund would go to the next of kin, if claimed by them, as an undisposed of part of the estate.

The contention is, that the fund was intended to be expended in the education of the complainant, then a child of twelve years of age, and not to be given to him outright as now claimed. That as the fund was not claimed during the years of usual education in schools and colleges, and no attempt was made during that time to enforce the trust, and as there is no evidence to show that it can or will be used in that way now or hereafter, and there is no prayer for a decree to that effect, the bill ought to have been dismissed. In our view of the evidence upon which the case was submitted, this question need not be passed upon.

3. We find nothing in the evidence to justify the charge in the bill that defendant's statement of intention to have an investment made of the sum of $1,000 for complainant's benefit was in aid of a scheme to procure the forfeiture of the legacy and to "lull him and his father into inaction."

The extract from defendant's letter of May 30, 1882, copied in the bill, does not fully disclose the situation at that time, and should be read in connection with several sentences immediately preceding it. After referring to information in respect of the contemplated baptism of his children and the gratification of their mother thereat, defendant said: "Your letter reminds me that they are your children, not mine. I will remember this in the future. It is with profound regret that I receive your decision regarding Walter, but if you fear that my influence would be baneful to the sacred relation of father and child, you are right."

This letter, and the final rejection of the legacy on June

22, 1882, set out in the answer and afterwards proved in the case are the only letters passing between the defendant and complainant's father that have been preserved by either. The fact that this final and unconditional declination of the benefit of the trust was not made until nearly a month after the letter acknowledging and accepting the first declination and expressing the intention to make a settlement of the defendant's own money for the benefit of the complainant, tends to support her statement, as a witness, that she continued, after May 30, 1882, to insist upon the acceptance of the legacy and the fulfillment of its conditions. Her brother admitted that she designated the Alexandria High School, and does not deny that it was unobjectionable as a school for boys. If no such offer or request was made by her after May 30, 1882, then there was no occasion for his positive and unequivocal rejection of the terms of the legacy made in writing on June 22. Nor does he anywhere say that anything more was said to her in regard to her intention of making a settlement upon complainant, or that this final declination was in consideration of, or founded upon, a reliance in her previous declaration of that intention. Denying defendant's statements of her offers between May 30 and June 22, he says that after the latter date, and before the customary commencement of the school year in the fall, he wrote to defendant withdrawing his objection to her acting as trustee under the will and requesting her to proceed with the execution of the said trust. Her reply to this, he says, was a refusal to recognize complainant as any longer entitled to the benefits of the trust. According to this, he had not accepted the substitution of her expressed intention of the settlement, for the trust created by the will, and he does not intimate that she referred thereto in her declaration that the trust of the will had failed or been forfeited. In an attempt, however to account for his failure then, or during his son's minority, to take any step whatsoever looking to the enforcement of the trust, he says that he relied upon

the defendant's fulfillment of the pledge she had made to invest the fund for complainant's benefit, but he does not say that he so informed her.

The contention founded on this evidence is, that the provision for the forfeiture of the benefits of the trust must be strictly construed; that the declination of the legacy, June 22, 1882, having been made at a time when no schools were in session, was premature, and complainant's parents had, at least until the commencement of the school year, the right to reconsider this premature declination and exercise their right to accept. The declination by the father, in June, 1882, was sufficient, at the time to authorize the defendant to claim the fund as her own under the terms of the bequest, and we do not find it necessary to decide whether that declination could be withdrawn in a reasonable time and the trust thereby reopened against the will of the defendant, because we do not find that the evidence raises the point.

In the face of the acknowledged express rejection made in writing, June 22, 1882, the burden was on complainant to show that it had been recalled and reconsidered. His father positively asserts the fact, and the defendant likewise denies it. There is no other direct evidence. The relations of brother and sister were strained. Her first communication to him after the death of their father was through a mutual friend in Baltimore to whom she wrote. This was Mr. Dickinson, to whom she referred later as the person whom she would ask to invest the money for complainant and to prepare the papers necessary to secure it to him. There is no evidence by him or anyone else. As before stated, all the letters passing between brother and sister had been destroyed before the litigation began, save the letter containing the statement in regard to the intended investment, which he preserved, and the declination of the legacy, which has been preserved by her. There is nothing in the evidence to create the suspicion, as regards either party, that this correspond

ence was destroyed with any other than a proper motive. Nor is there anything that would justify us in giving credence to the brother rather than the sister, on the ground of her interest in the subject matter, for he is as likely, under the circumstances, to be unduly influenced as she. If the money be finally lost to the son, as has been its aid in his education, it will be the result of his father's conduct; and the desire to avoid possible blame therefor would, to say the least, be as potent in its influence upon one's testimony as the mere desire for the money involved. With the evidenceevenly balanced the complainant would necessarily fail.

But we can not say that it is evenly balanced, because, in our opinion, the circumstances of the case tend to support the testimony of the defendant. Hers is perfectly consistent therewith; whilst his is not altogether so. Founded, necessarily, on the information given by his father, the complainant's bill sets up two inconsistent claims for relief; first, the trust created by the will; and second, the trust created by the defendant's declaration of the intended investment of the money obtained by her through the failure of the trust of the will. Again, if the father, who needed assistance, as he admits, in the proper education of his son, actually withdrew his declination of the trust created by the will, and considered it thereby enforceable, it is strange that he made no further demand after the fall of 1882, and no protest, and took no steps to compel execution. We do not think it a reasonably sufficient explanation to say that he relied on defendant's fulfillment of her pledge to invest the money for his son's benefit. The withdrawal of the declination of the legacy and the demand for the execution of the trust thereof, constituted an express declination of the offer of investment as a substitute therefor. It is true he preserved the letter containing this "pledge;" but he says that its preservation was accidental. A man of his apparent intelligence could not easily have been misled by the declaration therein;

and the state of feeling between him and his sister at the time was not such as to beget overconfidence and trust.

Her language is plain. She does not say that she has invested the money. She does not say that she holds, and will hold it, in trust. She simply says that she had decided that the money (not his under the trust, but her own by virtue of its rejection or forfeiture), " shall be invested by Mr. Dickinson in Walter's name to be given him with the accumulated interest on his reaching manhood." Then follow the significant words: " He (Mr. Dickinson) will show me how to draw up a paper to insure it to him in the event of my death."*

No inquiry was ever made of Mr. Dickinson to learn if the investment had been made or the paper drawn; and none was made of the defendant. Had there been inquiry the information would certainly have been obtained (and which defendant says she conveyed in one of her letters) that no money had been delivered to Mr. Dickinson, and that none had been invested, or would be.

4. This brings us to the contention, in support of the decree, founded on the foregoing letter as creating a trust that ought to be enforced by a court of equity. The letter, as we have seen, contained no express declaration that the writer held the money in trust or as a trustee; it contained nothing more than the expression of an intention to make an investment—to create a trust in the future—for the benefit of the complainant. It would do violence to the language used to say that it amounted to anything more than a mere promise, without consideration, to make a gift in the future—to have an investment made of a sum of money, and then to prepare papers to secure the same to the donee.

It is an undoubted proposition that equity will not enforce a contract to create a trust, or any executory contract, that does not rest upon a valuable consideration. The character of the promise or declaration in this case is so

plain that we do not deem it necessary or important to go into the numerous decisions that have been made in suits for the enforcement of imperfect gifts and incomplete trusts. In addition to the cases cited in the briefs of counsel, see *Richards* v. *Delbridge*, L. R. 18 Eq. 11; *Kekewich* v. *Manning*, 1 DeGex, M. & G. 176; *Milroy* v. *Lord*, 4 DeG., F. & J. 264; *Dennison* v. *Goehring*, 7 Barr, 175, 178; *Stone* v. *Hackett*, 12 Gray, 227, 230; 2 Pom. Eq. Jur., Sec. 997, and cases cited.

There has been a general agreement upon the principle above stated, and whatever apparent conflict there may appear in the cases arises wholly out of the peculiar provisions of the instruments to be construed or the effect to be given to certain special facts constituting the alleged trust.

Whenever it has been determined that there has been a perfected gift or transfer of title, equity has enforced it though without consideration. Likewise it has enforced trusts in behalf of volunteers, without regard to the form of words used to declare the intent when they have been found equivalent to the declaration of a complete trust. But in no case, certainly in none that has not been overruled or discredited, will it be found that a mere promise to make a gift or to create a trust in the future in favor of a volunteer, without even a meritorious consideration to support it, has ever been enforced against the promissor.

For the reasons given, the decree must be reversed, with costs, and the cause remanded, with directions to dismiss the bill.

*Reversed.*